IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LISA GUNDERSON,

   Plaintiff,

vs.            CIVIL NO. 03-00737 JP/RLP

BRADBURY STAMM CONSTRUCTION,
INC., a New Mexico corporation,

   Defendant.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DAMAGES

COMES NOW Plaintiff, by and through her attorney of record, J. Edward Hollington, J. Edward Hollington & Associates, and for her Response in Opposition to Defendant's Motion for Partial Summary Judgment on Damages (MPSJ), states:

1. **INTRODUCTION:**

Plaintiff, Lisa Gunderson (hereinafter, Ms. Gunderson), brings claims against Defendant Bradbury Stamm Construction (BSC) for discrimination, retaliation, and retaliatory discharge (state claim). Apparently, by the absence of a defense motion for summary judgment against Ms. Gunderson's claims, BSC concedes there are sufficient material facts from which a jury could reasonably conclude violations of Title VII, the New Mexico Human Rights Act, and retaliatory discharge. Defendant's Motion for Partial Summary Judgment only addresses the issue of mitigation of damages, and requests this Court to conclude as a matter of law that Ms. Gunderson failed to mitigate her damages (Defendant's MPSJ, pp. 2-3). Generally, mitigation of damages is a fact question to be decided by a jury. Smith v. Diffee Ford, 298 F.3d 955, 964 (10th Cir. 2002).

In the spring of 2002, Ms. Gunderson learned she was pregnant. She and her husband, Bruce Gunderson, an architect intern, started planning for the arrival of their first child. They did not want their child to be brought up in a daycare center, and decided one parent would stay home to care for the newborn until the child was old enough to start preschool. (Affidavit of Lisa Gunderson attached as **Exhibit 1**; Bruce Gunderson deposition, p. 23, ll. 4-8, **Exhibit 2**).

Ms. Gunderson was earning $40,000.00 a year, plus benefits, almost twice what Bruce Gunderson was making. She and her husband decided that they could continue to make ends meet by Ms. Gunderson returning to her full time project engineer job after her Family Medical Leave Act (FMLA) leave. Bruce Gunderson would quit his job and stay home with their child. Ms. Gunderson told Jim Lloyd, her direct supervisor and Chief Operation Officer of BSC, and Ellen Carle, Human Resources Manager, of their plans (Ms. Gunderson's return to full time work after FMLA, husband quits job to take care of child) around the time she had announced news of her pregnancy to her colleagues at BSC. Bruce Gunderson also told his employer of his plans to resign to take care of their child. (Affidavit, Lisa Gunderson, attached hereto, **Exhibit 1**; Defendant's Undisputed Fact (UDF) Nos. 4, 13, and Plaintiff's Response to UDF 15 infra).

Ms. Gunderson's plan to return to her job as a project engineer, and continue her career in the construction field after her FMLA leave suddenly changed on September 13, 2002 when BSC terminated her employment. (Lisa Gunderson deposition, p. 157, l. 17 - p. 158, l. 4; p. 194, 2 - p. 193, l. 6, attached as **Exhibit 3**). At the time of her termination, she was about seven months pregnant. Ms. Gunderson immediately started searching for comparable jobs in the construction field, and when nothing was offered she broadened her search to other jobs. (Plaintiff's

Response to Defendant's Undisputed Facts (UDF), Nos. 14 and 15 infra). She was not able to find employment before the birth of their child, Asa, on January 7, 2003.

Bruce Gunderson's job provided the only steady income for the family when Asa was born. BSC's termination of Ms. Gunderson's employment forced Bruce Gunderson to keep his job to ensure income for the family, and Ms. Gunderson was compelled to become the primary caregiver for their baby instead of Mr. Gunderson as originally planned. The Gunderson family could not risk Bruce quitting his job in the hope Ms. Gunderson would find a project engineer job with another construction company, especially after her unsuccessful attempts to find such work before Asa's birth. (Lisa Gunderson Affidavit, **Exhibit 1**, and Plaintiff's Response to UDF Nos. 14 and 15 infra). Ms. Gunderson has found part time employment during times her husband is off work and is able to take care of Asa.

BSC argues that a jury should not be allowed to consider loss of income damages after April 7, 2003 because Ms. Gunderson's decision to stay home with her child was a personal decision. (Defendant's MPSJ, p. 3). The cases cited by Defendant do not support such conclusion. One case characterizes a personal choice as one "freely" made by a Plaintiff, and not related to Defendant's conduct. Meyers v. UAL, 950 F. Supp. 874, 877-78 (N.D. Ill. 1997).

Ms. Gunderson's decision to become the primary caregiver was directly related to her termination by BSC, and she was did not "freely" make the decision to stay home. A jury can reasonably conclude, but for BSC's wrongful termination of Ms. Gunderson, she would have resumed full time employment as a project engineer, and her husband would have stayed home as the primary caregiver. BSC also knew of Ms. Gunderson's family plans for her return to full time work, and her husband's plans to quit his position before it terminated her employment.

3

(Lisa Gunderson Affidavit, **Exhibit 1**). This is an important fact which is not present in any of the cases cited by the Defendant in support of its MPSJ.

The 10th Circuit has recently held that an employee claiming wrongful termination who refused to relocate his family for another job, then quit a job to start his own business, and failed to seek employment in the national market, did not as a matter of law establish a failure to mitigate. Minshall v. McGraw Hill Broadcasting, 323 F.3d 1273, 1287-88 (10th Cir. 2003). Any decision a parent makes about the welfare of their child is personal. The question for this jury will be whether the decision that Ms. Gunderson become the primary caregiver was caused by Defendant's wrongful conduct. Ms. Gunderson presents sufficient facts for the jury to consider the amounts and duration of damages, and whether she mitigated those damages. (UJI 13-1803, 1811, 1821-22 (NMRA 2004).

## II. SUMMARY JUDGMENT STANDARD:

In reviewing motions for summary judgment, courts must examine the record and make all reasonable inferences in the light most favorable to the non-moving party. Munoz v. St. Mary Corwin Hospital, 221 F.3d 1160, 1164 (10th Cir. 2000). BSC bears the initial burden of establishing no genuine issue as to any material fact. The employer has the burden of proof to show that a Plaintiff did not exercise reasonable diligence in seeking other employment. Spulak v. K-Mart Corp., 894 F.2d 1150, 1158 (10th Cir. 1990). To meet this burden of proof, BSC must establish 1) there were other suitable positions available which Plaintiff could have discovered; and 2) that Lisa Gunderson failed to use reasonable care and diligence in seeking other work. EEOC v. Sandia Corp., 639 F.2d 600, 627 (10th Cir. 1980). The law only requires that a claimant make an honest good faith effort to mitigate damages by seeking other jobs. Spulak at 1158.

BSC does not meet its burden of proof because it presents no evidence that there were suitable positions available which Plaintiff could have discovered. BSC argues it should be excused from presenting material facts of other available positions because Ms. Gunderson made no reasonable effort to seek employment. BSC cites cases from the 2nd Circuit, 5th Circuit, and 11th Circuit, and one Iowa District Court decision for its claim that it is not required to meet the first prong of its burden of proof for mitigation of damages. (Defendant's MPSJ, pp. 10-11). There are two important points which prevent Defendant's cases from controlling its burden of proof in its MPSJ. First, all of the cases from other circuits were decided based on post-trial motion decisions, not summary judgment motions. Greenway, 143 F.3d 47, 49-50 (2nd Cir. 1998); Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1518 (11th Cir. 1991); Sellers v. Delgado College, 902 F.2d 1189, 1190 (5th Cir. 1990); Baker v. Morrell & Co., 263 F. Supp. 2d 1161, 1169 (ND Iowa 2003). Second, in Sellers v. Delgado, the Court emphasized that whether a Title VII claimant uses reasonable diligence in obtaining substantially comparable employment is a determination of fact. Id. 1192. The 10th Circuit has not adopted the exception that relieves an employer from their burden of showing availability of other employment. In the case of Manning v. McGraw-Hill, Inc., 64 F. Supp. 2d 996, 999 (Dist. Colo. 1998), the District Court declined to adopt the per se rule of Greenway, holding "efforts at a new career, which are reasonable and in good faith under the circumstances, are acceptable alternatives to finding employment similar to that lost," at 999. The case was reversed on different grounds. Manning v. McGraw-Hill, 2000 U.S. App. Lexis 13,934 (10th Cir. 2000).

BSC fails to present any evidence to satisfy the first prong of its burden of proof, and the Court should not, as a matter of law, decide at this time that Plaintiff failed to mitigate her damages.

## III. PLAINTIFF PRESENTS SUFFICIENT FACTS FOR A JURY TO DETERMINE THE ISSUE OF MITIGATION:

The claimant need only make a reasonable and good faith effort to mitigate, and is not held to the highest standards of diligence. Spulak at 1158. Ms. Gunderson diligently sought similar employment in the construction field shortly after her termination, searching classified ads, Monster.com, asking acquaintances of job openings, submitting resumes and job applications, and following up with phone conversations. (Lisa Gundereson Affidavit, **Exhibit 1**; Lisa Gunderson Deposition, p. 160, ll. 5-18; p. 163, l. 14 - p. 166, l. 19; p. 167, l. 3 - p. 172, l. 25; p. 174, l. 19 - p. 175, l. 12; p. 176, l. 1 - p. 177, l. 13, **Exhibit 3**). When she found no similar position in the construction field, she broadened her search into other fields. Id. No job offers were made to Ms. Gunderson before the birth of her child. As discussed above, after BSC terminated Ms. Gunderson, her husband Bruce became the sole source of income for the family. The termination caused their original plans to be changed, and it was no longer feasible for Mr. Gunderson to quit his job. Ms. Gunderson was forced to stay home as the primary caregiver because the family could not risk losing Mr. Gunderson's income. They could not afford to pay daycare for Ms. Gunderson to resume her full time search for similar employment in the construction field, especially since her previous efforts had not turned up any job offers. (Affidavit of Lisa Gunderson, **Exhibit 1**).

After Asa was born, Ms. Gunderson continued her search for jobs in the construction field, and other fields. (Lisa Gunderson Affidavit, **Exhibit 1**; Lisa Gunderson Deposition, p. 205, ll. 14 - 19; p. 216, l. 1 - p. 217, l. 15, **Exhibit 3**; Bruce Gunderson Deposition, p. 23, ll. 9 - 12, **Exhibit 2**; and Plaintiff's Responses to UDF Nos. 14, 20-21 infra.). Ms. Gunderson accepted part time work in a department store, and holds a second part time job as a "mystery shopper." (Defendant's UDF Nos. 19, 23, and Plaintiff's Response to Defendant's UDF No. 24).

Whether one applies the search for "comparable position" standard required for Title VII claims, or her duty under her state claims to "secure other employment," Ms. Gunderson presents sufficient facts from which a reasonable jury could conclude she used reasonable efforts to mitigate her damages. (Vigil v. Arzola, 102 NM 682, 691 (Ct. App. 1983), establishing mitigation standard for retaliatory discharge; Minshal v. McGraw-Hill, Id. at 1287-88.)

## IV.  STANDARDS FOR AWARDING BACK PAY AND FRONT PAY:

The purpose of back pay is to make whole a victim of discrimination for losses from the date of termination to judgment. EEOC v. LeeWay, 625 F.2d 918, 948 (10th Cir. 1979). Front pay furthers the remedial purpose of anti-discrimination statutes by assuring that an aggrieved party is returned to as nearly as possible the economic situation she would have enjoyed but for the defendant's wrongful conduct. EEOC v. Prudential, 763 R.2d 1166, 1173 (10th Cir. 1985) cited in Abuan v. Level 3 Com., 353 F.3d 1158, 1176 (10th Cir. 2003). Courts should strive to award the most complete relief possible by ascertaining the amount required to compensate a victim for continuing effects of discrimination until the victim can be made whole. Carter v. Sedgwick County, 36 F.3d 952, 957 (10th Cir. 1994).

7

Generally, juries determine back pay, and courts determine front pay after trial. Smith v. Diffe Ford, 298 F.3d 955, 964 (10th Cir. 2002). Numerous factors are relevant in assessing front pay, including work life expectancy, salary and benefits at the time of termination, potential increases in salary, reasonable availability of other work opportunities, within which a plaintiff may become re-employed with reasonable efforts, and present value discount for future losses. A front pay award should reflect the individualized circumstances of the Plaintiff. The court may consider all evidence presented at trial in formulating a proper front pay award. Davoll v. Webb, 194 F.3d 1116, 1144-45 (10th Cir. 1999).

When legal (back pay) and equitable (front pay) issues to be decided in the same case depend on a common determination of fact, such questions of fact are submitted to the jury and the court in resolving equitable issues is bound by the jury's findings on them. Smith v. Diffe Ford at 965.

Given the individual circumstances of the Plaintiff, and her efforts to find other employment, the jury should be permitted to decide the issue of mitigation of damages. After the trial, the Court can then determine the issue of front pay for Title VII, based on all of the facts and evidence presented, the jury's decisions, and appropriate legal principles.

## V.     DEFENDANT'S CASES DISTINGUISHED:

BSC cites no 10th Circuit authority for granting a partial summary judgment on the issue of mitigation of damages with facts and circumstances similar to these in this case. BSC cites cases from other jurisdictions which decisions are based on different facts and circumstances from Ms. Gunderson's. In the case of Meyer v. UAL, 950 F. Supp. 874 (ND Ill. 1997), the plaintiff alleged she was constructively discharged, and prior to her departure from employment

8

with the defendant, she had accepted part time work as an attorney in Cook County State Attorney's Office. She did not seek any other employment opportunities, full time or part time. Id. 875. The plaintiff in that case claimed child care requirements limited her to part time work. Unlike Ms. Gunderson, the plaintiff in Meyer's had decided to work part time before she was terminated. The court in Meyer concluded the employer should not be liable for any damages which were not the result of discrimination. Id., p. 77. In Ms. Gunderson's case, BSC's discrimination/retaliation caused her to become the primary caregiver of their child, and not be able to work full time. Additionally, Ms. Gunderson had made extensive efforts to locate other similar employment, unlike the plaintiff in Meyer.

In another District Court case, Baker v. Morrell, 263 F. Supp. 2d 1161, 1181-82 (ND Ia. 2003), where the Court was considering a Motion to Amend Judgment, the Court made a deduction from its award of front pay because the plaintiff had voluntarily quit a post-termination job to move to another city to care for her sick brother. Id. 1180. The Court concluded that the defendant failed to present evidence that other employment was available, or that the plaintiff did not make an honest good-faith effort to minimize her damages by obtaining full time employment. Id. 1181. In reducing the front pay award, the Court reasoned that the plaintiff's decision to quit a job to care for her brother was not a decision related to the discriminatory conduct of the defendant. Ms. Gunderson's decision to be the primary caregiver for her child is directly related to the discriminatory/retaliatory conduct of BSC. It is interesting to note that the Court in Baker concludes that even where there's a failure to mitigate that does not completely foreclose a front pay award. Id. 1181.

In the case Excel Corp. v. Bosley, 165 F.3d 635 (8th Cir. 1999), the jury found against a front pay award, and the plaintiff presented no evidence of job searches during the trial.

The 11th Circuit Court held that a plaintiff who voluntarily left a job after termination because of financial pressures did not forfeit the right to back pay. Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1529 (11th Cir. 1991). The Court did affirm the trial court's finding that Weaver had not earnestly begun looking for a substantially similar position for over a year after termination. Ms. Gunderson immediately began looking for comparable work in the construction field after her termination. Finally, in the case of Sellers v. Delgado College, 902 F.2d 1189 (5th Cir. 1990), the Court affirmed a trial court judgment that included no award of back pay. During the trial, the defendant had presented significant evidence of other available positions, and the plaintiff submitted only two job applications during a two-year period. Id. 1195-96. In this case, BSC presents no evidence of availability of other similar job positions, and Ms. Gunderson provides extensive evidence of her efforts to obtain other work.

The facts and circumstances of cases cited by the Defendant are much different than Ms. Gunderson's, and do not support entry of partial summary judgment on the issue of mitigation of damages.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S UNDISPUTED FACTS (UDF)

Plaintiff responds to Defendant's UDFs by the numbers that appear in Defendant's Motion and Memorandum (see Defendant's MPSJ, pp. 3-7):

UDF Nos. 1 - 9: Plaintiff admits.

UDF 10: Plaintiff denies because Defendant's facts stated in UDF 10 are incomplete, inaccurate, and misleading. After Ms. Gunderson's discussion with BSC's in-house counsel,

10

Emeline "Mickey" Beisman. Ms. Beisman, as corporate counsel, wrote a memo to the president of BSC, Jim King, on July 31, 2002. In the memo, Ms. Beisman explained that requiring pregnant employees to get a doctor's excuse to take their full 12 weeks of FMLA leave was a serious violation of FMLA and exposed the company to liability and possible administrative action by the labor board. She referred to Ms. Gunderson's complaint of FMLA violations in her memo. The president of BSC and its HR manager, Ellen Carle, read and reviewed Ms. Beisman's memo. Carle disagreed with the corporate counsel's opinion about FMLA leave for pregnant employees, and told the president, Jim King, that requiring a doctor's excuse had been the procedure BSC had always followed. King responded that they should keep the policy the way it has been in the past. (Ellen Carle (EC) Deposition, p. 107, ll. 2-14, **Exhibit 4**; and Mickey Beisman Memo of violations of FMLA, dated July 31, 2002, attached as Exhibit 14 to EC Deposition, and attached hereto as **Exhibit 5**).

One year before Ms. Gunderson objected to the BSC FMLA policy, another pregnant employee had objected to the requirement of getting a doctor's excuse to take her 12 weeks of FMLA leave. Ellen Carle took no action at that time to clarify BSC's FMLA leave policy for pregnant employees, and continued to enforce the requirement for a doctor's excuse. Carle never contacted the Department of Labor to confirm whether BSC's policy complied with FMLA, and she did not believe BSC's corporate counsel's interpretation of FMLA was correct. (EC Depo., p. 109, l. 17 - p. 110, l. 24; p. 113, ll. 3-10; and p. 115, ll. 10-16 attached as **Exhibit 4**).

After Mickey Beisman sent her memo of July 31, 2002 regarding illegal FMLA actions, Carle called other HR persons and learned they were giving up to the full 12 weeks without requiring a doctor's excuse. At some time after July 31, 2002. Jim King, president, and Ellen

11

Carle, HR manager, agreed the policy of BSC should be changed. They did not tell Ms. Gunderson of the policy's change, nor did they issue memos to employees explaining the policy change. (EC Deposition, p. 107, ll. 15-25; p. 115, ll. 2-4; p. 116, ll. 20-23, **Exhibit 4**).

On August 12, 2002, Mickey Beisman, BSC's corporate counsel's employment ended with BSC. Ms. Beisman alleges that she was terminated in part because of her objections to violations of FMLA, and this is the subject of a separate lawsuit captioned <u>Beisman v. BSC</u> filed in the Second Judicial District Court, case no. CV 2000-00485. On September 13, 2002, Plaintiff, Ms. Gunderson's employment was terminated by BSC, just six weeks after Ms. Beisman sent the FMLA violation memo to the president of the corporation.

UDF 11: Deny. Ms. Gunderson first discussed FMLA with Carle in late June of 2002. (See Plaintiff's Response to Interrogatory No. 6 attached to Defendant's MPSJ as Exhibit D, and LG Depo., p. 86, l. 19 - p. 87, l. 1, **Exhibit 3**).

UDF 12 and 13: Plaintiff admits.

UDF 14 and 15: Plaintiff admits UDF 15. In response to UDF 14, shortly after Ms. Gunderson learned of her pregnancy, she and her husband began planning for the arrival of their first child. They agreed that they did not want their child to be brought up in a daycare setting, and one parent would stay home with the child. Ms. Gunderson and her husband decided that she would keep her full time job as a project engineer with Bradbury Stamm because she was earning almost twice the income of her husband, and Mr. Gunderson would stay home to be the primary caregiver for the newborn child. Ms. Gunderson advised her immediate supervisor, Jim Lloyd, chief operating officer of the corporation, and Ellen Carle, HR manager, of the plan for

Mr. Gunderson to quit his job, and Ms. Gunderson to return to full time employment after her FMLA 12 week leave. (Affidavit, Lisa Gunderson, attached hereto as **Exhibit 1**).

Within days of Ms. Gunderson's termination from Bradbury Stamm, she began a diligent search for similar work with other construction companies, and when no positions were offered, she sought full time work with other employers. (LG Depo., p. 137, ll. 4-18; p. 160, ll. 5-17; p. 163, l. 14 - p. 172, l. 22; p. 174, l. 19 - p. 177, l. 13, attached as **Exhibit 3**).

After the birth of their child, Ms. Gunderson could not resume full time employment, as she and her husband had originally planned, because she had not found another job, and her husband Bruce had to keep his full time job, as he was the sole source of income and benefits for the family at that time. She was required to stay at home as the primary caregiver. (LG Deposition, p. 138, ll. 16-22, **Exhibit 3**).

Ms. Gunderson started looking for part time work in the construction field, retail field, and any other fields in which she had experience after her child's birth. She was limited to part time work because she would only be able to work hours that her husband was off work when he could take care of their child. (LG Depo., pg 195, l.3 - p. 196, l. 6, **Exhibit 3**). Ms. Gunderson never stopped searching for work in the construction field, even after the birth of her child. (LG Affidavit, **Exhibit 1**; LG Depo., p. 205, ll. 14-19; p. 216, l. 1 - p. 217, l. 15, **Exhibit 3**; Bruce Gunderson Deposition, p. 21, l. 19 - p. 23, l. 4; p. 23, ll. 9-12, **Exhibit 2**).

Plaintiff and her husband could not afford to pay for daycare or child care for Ms. Gunderson to spend full time looking for other employment, especially since she had been unsuccessful in finding such work prior to the birth of their son. (Affidavit, Lisa Gunderson attached hereto as **Exhibit 1**).

13

When their child is old enough to start pre-school, Ms. Gunderson will be able to look for full time work in her chosen field of construction. (Bruce Gunderson Deposition, p. 23, ll. 4-8, **Exhibit 2**).

Ms. Gunderson's decision to have a child did not have an adverse impact on her career. It was BSC's termination of her employment which adversely affected her career. (LG Depo., p. 157, l. 17 - p. 158, l. 1; p. 192, l. 2 - p. 193, l. 6, **Exhibit 3**).

UDF 16: Plaintiff admits all of UDF 16 except she "looked strictly for 10-20 hours of part time retail-type work." (See Plaintiff's response to UDF 14, and references to Ms. Gunderson's continuing efforts to find work in the construction field).

UDF 17: Ms. Gunderson admits that she was looking for part time work during the hours her husband could stay at home with their child. The decision to look for part time work was not based solely on her desire to stay with their baby or husband, but was a direct result of the wrongful termination of her employment by BSC. (See Plaintiff's response to UDF 14, incorporated herein by reference).

UDF 18 and 19: Plaintiff admits.

UDF 20: Plaintiff admits, except she continued her search for comparable work in the construction industry which would be considered a professional position. (LG Affidavit, **Exhibit 1**; LG Depo., p. 216, ll. 15-18, attached to Defendant's MPSJ).

UDF 21 and 22: Admit.

UDF 23: Admit.

UDF 24: Plaintiff admits the first sentence of UDF 24, and denies the last sentence of UDF 24. Ms. Gunderson turned the position down because the hours had been changed from the

time she was first offered the position.(See LG Depo., p. 215, ll. 1-25, attached to Defendant's MPSJ).

## CONCLUSION

Plaintiff respectfully requests that this Court deny Defendant's MPSJ. Defendant fails in its burden of proof by lack of any evidence of availability of similar jobs which Ms. Gunderson could have discovered. There are sufficient material facts for a reasonable jury to determine whether Ms. Gunderson's efforts to find other employment were reasonable and done in good faith.

Respectfully submitted,

J. EDWARD HOLLINGTON & ASSOCIATES, P.A.

J. Edward Hollington
Attorney for Plaintiff
708 Marquette Ave. NW
Albuquerque NM 87102
(505) 843-9171

I hereby certify that a true and complete copy of the above pleading was mailed on this 3rd day of June, 2004 to the following counsel of record:

Karen S. Mendenhall, Esq.
Eaves Bardacke Baugh Kierst & Larson, P.A.
P.O. Box 35670
Albuquerque NM 87176-5670

J. Edward Hollington

F:\Gunderson\Pleadings\response in opposition (Mo for Partial SJ on Damages).wpd

15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LISA GUNDERSON,

      Plaintiff,

vs.                              CIVIL NO. 03-00737 JP/RLP

BRADBURY STAMM CONSTRUCTION,
INC., a New Mexico corporation,

      Defendant.

## AFFIDAVIT OF LISA GUNDERSON

STATE OF NEW MEXICO    )
                                 )ss.
COUNTY OF BERNALILLO    )

      LISA GUNDERSON, being first duly deposed, and under oath, states:

1. I am over the age of 18.

2. I am a resident of Albuquerque, Bernalillo County, New Mexico.

3. I am the Plaintiff in the above referenced case.

4. In April of 2002, I learned that I was pregnant. During April of 2002, I told my supervisor, Jim Lloyd, Chief Operating Officer of Bradbury Stamm Construction (BSC), and in late June told Ellen Carle, Human Resources Manager, BSC, and the project managers I was working with, of my pregnancy.

5. My husband is Bruce Gunderson. Shortly after we learned of my pregnancy, we discussed our future plans after the birth of our first child. At that time, I was earning $40,000.00 per year, plus benefits, almost twice what my husband was earning as an intern architect. We decided that after the birth of our child, Bruce would quit his job and stay home to be the primary caregiver for our newborn. After taking 12 weeks family medical leave



(FMLA), I would return to my full time position as a project engineer at BSC. It was important to my husband and I that our child not be raised in a daycare center.

6. During the summer of 2002, I told my supervisor, Jim Lloyd, and Ellen Carle, Human Resources Manager, of our plans for me to return to work full time as a project engineer after my FMLA leave, and that my husband would quit his job and stay at home as a primary caregiver for our newborn.

7. During the summer of 2002, my husband, Bruce Gunderson, gave his employer notice of his intent to resign following the birth of our child.

8. On September 13, 2002, I was terminated from my employment with BSC.

9. I loved my job at BSC, and planned to make a career in the construction field. My goal was to work toward promotions to a project manager or higher position.

10. Four days after I was terminated, I began diligent efforts to find similar work with construction companies in the Albuquerque area. I was offered no positions, and began making applications for other jobs in other fields. I was not offered a job before the birth of my son, Asa, on January 7, 2003.

11. After my termination from BSC, our family income consisted of salary and benefits received by my husband Bruce.

12. My family could not financially jeopardize the loss of my husband's income if he quit and I was forced to become the primary caregiver for our newborn, instead of Bruce as we had originally planned.

13. Our family could not afford to pay for daycare or a babysitter for me to spend full time looking for another full time job in the construction field, especially since I had found no

2

jobs after I was fired before the birth of Asa. I constantly looked for other work in the construction field, but found no job offers for project engineers or similar positions.

14. I believe I was wrongfully terminated by BSC, and as a result of that termination, our plans for me to resume full time work with BSC, and my husband to quit his position, were forced to be changed, and as a result I became the primary caregiver of our newborn child.

15. When our child is old enough to start school, I will be able to look for full time work.

16. The wrongful termination of my job by BSC also adversely affected my husband's career. Had he stayed at home with Asa, as originally planned, he intended to begin taking a few classes to complete his Masters degree in architecture. By taking evening and weekend classes, he could have completed course requirements in 4-5 years. Because he was required to continue his full time job after the birth of Asa, and with my part time work, he has not been able to schedule enrollment for his Masters degree classes.

*[signature]*
LISA GUNDERSON

Subscribed and sworn to before me this _2nd_ day of June, 2004 by LISA GUNDERSON.

*[signature]*
NOTARY PUBLIC

My commission expires:
_4-6-2006_

H:\DATA ON SERVER D\Gunderson\Pleadings\Affidavit of Gunderson.wpd

**THE EXHIBITS ATTACHED TO THIS PLEADING ARE TOO VOLUMINOUS TO SCAN. SAID EXHIBITS ARE ATTACHED TO THE ORIGINAL PLEADING IN THE CASE FILE WHICH IS LOCATED IN THE RECORDS DEPARTMENT, U.S. DISTRICT COURT CLERK'S OFFICE...**